Filed 6/20/16  P. v. Ambriz CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL AMBRIZ,<br><br>    Defendant and Appellant. | G051835<br><br>(Super. Ct. No. 12NF2093)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Elizabeth G. Macias, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Daniel Ambriz of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1))[1] and active gang participation (§ 186.22, subd. (a)), and found true he committed the felon in possession offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Defendant admitted having suffered two prior strike convictions with attached enhancements, and the court exercised its discretion under section 1385, subdivision (a), to dismiss one prior. The court sentenced him to a prison term of 12 years.

On appeal defendant contends insufficient evidence showed he had possession, custody, or control of the firearm. We disagree and affirm the judgment.

FACTS

Around 9:00 p.m. on June 30, 2012, Officer Matthew Ellis and his partner Officer Hernandez were driving through an alley located at 700 North Anna Drive in Anaheim, when they saw a red truck parked in a carport, with two men (later identified as Alan Reyes and Angel Bribiesca) standing near the tailgate. Reyes and Bribiesca ducked behind the truck. As Ellis and Hernandez pulled alongside the truck, Hernandez told Ellis he recognized the two men. The officers got out of the patrol car. Ellis noticed defendant standing near the truck's passenger door. The officers commanded defendant to come to the back of the truck where Reyes and Bribiesca were standing; defendant complied.

---

[1] All statutory references are to the Penal Code.

2

As Hernandez searched Bribiesca, Ellis saw defendant move his hands toward his pocket, so Ellis asked Hernandez to search defendant next. When Hernandez began searching defendant, defendant started to reach into his pocket again and Hernandez had a short struggle with him. Ellis called for officer assistance. He saw defendant make a movement as though he were throwing something toward the back of the truck. Hernandez placed defendant in handcuffs.

Ellis went to the back of the truck and saw several trash bags in the truck bed. The hand grip and rear of a semiautomatic handgun was partially exposed under a red trash bag. Also in the truck bed was a methamphetamine pipe and a used syringe; on the rear bumper was a bottle.

Reyes had a leather holster tucked into the front waistband of his pants. The firearm fit in the holster.

Painted on garage doors on the opposite side of the alley was Eastside Anaheim gang graffiti.

In police interviews at the station, Ellis read defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant said he had been hanging out with the Eastside Anaheim gang for two years, but denied being a gang member. He identified his moniker as "Magic." He stated he knew Reyes and Bribiesca. He said that an enemy of the gang had caused the scar on top of his head. He said he knew nothing about the gun until the officers "pulled him out of the truck." But he also explained that a gang member who possesses a firearm is required to let the other gang members know because he is "on point or a lookout."

The parties stipulated the handgun bore DNA from at least three individuals, one of whom was Reyes. Defendant was excluded as a major contributor. The parties further stipulated Reyes and Bribiesca admitted being in felonious possession of a firearm on June 30, 2012.

3

*Evidence of Defendant's Gang Membership*

On several prior occasions, defendant had admitted he was a member of the Eastside Anaheim gang. For example, he made this admission on June 11, 2012, when police found him sitting with another person on a sidewalk, holding a shirt to the top of his head, with blood coming down his face. He had also made this admission in May 2012, after he rode his bike away from an unmarked police car because he thought the car occupants were going to "hit him up" and because "things were hot then" with "something going down between Eastside Anaheim and Citron Street."

He received and signed a STEP (Street Terrorism Enforcement and Preservation)[2] notice in February 2012, notifying him he could be charged with gang enhancements if he continued to associate with the gang. His outgoing jail letter dated November 5, 2013 indicated he had a connection with a gang. A June 19, 2012 search of his home uncovered Eastside Anaheim gang graffiti in his bedroom and letters from influential Eastside Anaheim gang members, including Bribiesca.

*Gang Expert Testimony*

Officer Jason States, a gang expert responsible for investigating the Eastside Anaheim gang and some other gangs in Orange County, testified that a gang member is "posting up" when he is "standing out" in his gang's neighborhood where he can be seen, either alone or in a group, in order to intimidate others and to claim and patrol the neighborhood. Rivals may enter a gang's neighborhood to disrespect the gang by painting graffiti or by conducting a "hit up" (i.e., asking someone where they are from or whether they "bang"). When a gang member is hit up and fails to claim his gang, he is demonstrating a punishable cowardice called "ranking out." In contrast, when a gang

---

[2] (§ 186.20 et seq.; *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1414 (*Sifuentes*).)

4

member talks with law enforcement, he may deny his membership in the gang without ranking out.

Firearms play a strong role in earning respect for a gang, both from average citizens and from rival gangs. A person with a gun will tell his fellow gang members about the gun, so they can retrieve it and return fire if the holder is shot, and also so they can distance themselves if the police arrive. When posting up, members keep the gun in close range by hiding it nearby. Generally, only actual gang members or associates have access to a gang gun. Gang members are expected to "back up" other members of their gang, e.g., in a fight.

States opined that, as of June 30, 2012, Eastside Anaheim was a criminal street gang, whose primary activities were firearm and narcotics sales, robberies, and felons possessing firearms. He also opined that, as of June 30, 2012, Reyes, Bribiesca, and defendant were active Eastside Anaheim gang members and participants. During a five-week period between May 18 to June 30 of 2012, defendant was contacted by police six times in Eastside Anaheim gang territory. Five of those times he was with other gang members, and four of those times he admitted to membership in the gang and said his moniker was Magic. In addition, prior to that five-week period, he had had contacts with police and had made admissions to them. An "ES" tattoo on his hands signified Eastside Anaheim. He also had tattoos commonly worn by Orange County and Anaheim gang members.

The 700 block of North Anna Drive in Anaheim "is the heart" or "the hub" of the Eastside Anaheim gang neighborhood. It is the "epicenter" where Eastside Anaheim gang members are *always* present. In the month or two before June 30, 2012, several shootings had occurred between Eastside Anaheim and a rival gang, Travelers City. Eastside Anaheim gang members had shot and killed a member of another rival gang, Citron Street, resulting in heightened tension with that gang as well.

5

States opined that, hypothetically, if three gang members are "posting up" in the heart of their gang area and one of them has a gun on his person or in close proximity, he is obligated to tell the others about the gun and would certainly do so during a time of high tensions with a rival gang. He further opined these three gang members would be actively participating on behalf of the gang. He also believed that having a gun in the heart of the gang area benefited the gang, because it enabled members to protect themselves, and elevated their status by intimidating the residents and demonstrating a willingness to do battle. Possessing a gun also furthered and promoted other criminal conduct by gang members, by enabling them to shoot or retaliate against members of rival gangs.

DISCUSSION

Defendant argues insufficient evidence showed he knowingly exercised a right to control the gun, as required to support a finding of constructive possession. He relies on this court's decision in *Sifuentes*, *supra*, 195 Cal.App.4th 1410.

"Our review of this issue is limited to determining whether substantial evidence supports the verdict." (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1416.) When "a criminal conviction [is] challenged as lacking evidentiary support[,] the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "A reviewing court must accept logical inferences the jury might have drawn from the circumstantial evidence." (*Sifuentes*, at p. 1416.) "'Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed. [Citation.]' [Citation.] We apply the same standard to

6

convictions based largely on circumstantial evidence." (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.)

Under section 29800, subdivision (a)(1), a felon "who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." "Possession may be physical or constructive, and more than one person may possess the same contraband." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

"Constructive possession means the object is not in the defendant's physical possession, but the defendant *knowingly* exercises control or the right to control the object." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831, italics added.) Stated another way, a defendant constructively possesses a weapon if it is not in his actual possession, but "is nonetheless under his *dominion and control*, either directly or through others." (*People v. Peńa* (1999) 74 Cal.App.4th 1078, 1083-1084, italics added.) Constructive possession must be intentional: A "felon who acquires possession of a firearm through misfortune or accident, but who has no intent to exercise control or to have custody, commits the prohibited act without the required wrongful intent." (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922.)

"Dominion and control" cannot be inferred from the defendant's mere proximity or access to the weapon. (*People v. Zyduck* (1969) 270 Cal.App.2d 334, 336.) "[S]omething more must be shown . . . ." (*Ibid.*) Nonetheless, "the necessary additional circumstances may, in some fact contexts, be rather slight." (*Ibid.*)

Defendant argues his case falls squarely within this court's holding in *Sifuentes*, *supra*, 195 Cal.App.4th 1410. There, we reversed Sifuentes's conviction for possession of a gun by a felon, after determining the evidence did "not support the conclusion Sifuentes had the right to control the firearm discovered near Lopez," his codefendant. (*Id.* at p. 1413.)

7

In *Sifuentes*, officers entered a room in a motel known for drug and prostitution activities, and saw the following scene. (*Sifuentes*, *supra*, 195 Cal.App.4th at pp. 1413-1414.) Sifuentes, a convicted felon, "lay on top of the bed nearest the door." (*Id.* at p. 1414.) "Lopez, also a convicted felon, knelt on the floor on the far side of the second bed, facing the officers. There were two women in the room. One lay naked under the sheets of the bed closest to Lopez. The other stood near the bathroom, wrapped in a towel." (*Ibid.*)

"An officer later found a loaded .40-caliber semiautomatic handgun under the mattress next to Lopez. Investigators did not test the gun for fingerprints or DNA. Officers also found methamphetamine and a pipe in Sifuentes's pocket." (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1414.) At trial a gang expert testified Sifuentes and Lopez were active participants in the same gang on the day of their arrest. (*Id.* at pp. 1414-1415.) The motel in question was *not* located in the territory claimed by their gang. (*Id.* at p. 1416.)

Upon Sifuentes's appeal from his felon in possession conviction, we observed that no evidence showed the weapon found under the mattress was a gang gun that had been used either offensively by a gang to commit crimes and assault rivals or defensively against rival gangs. (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1417.) The gang expert had testified a gang gun was "'accessible' to gang members 'at most times'" (*id*. at p. 1417), but also that unspecified restrictions existed on whether any particular gang member could use a gang gun (*id.* at pp. 1417-1418), thereby leaving open to question whether Sifuentes had any right to control the gun. Given that Sifuentes and Lopez had "simply occupied a motel room with two females," no evidence showed the men "had used or were about to use the gun offensively or defensively." (*Id.* at p. 1418.) Furthermore, even assuming the firearm was a gang gun, "no evidence showed Sifuentes had the right to control the weapon." (*Id.* at p. 1417.) The expert did *not* "link Sifuentes to the particular firearm found next to Lopez." (*Id.* at p. 1419.) "Even assuming the

8

expert implied Sifuentes could exercise control over the firearm, no evidentiary basis existed to support this conclusion." (*Ibid.*)

Here, in contrast, the location was *not* a motel room in which two naked women were present and which lay outside the gang's turf and in an area known for prostitution. Rather, in the instant case, the following circumstances suggested defendant, Reyes, and Bribiesca were posting up for Eastside Anaheim on the night in question: At 9:00 p.m., these three active gang participants were standing in the heart of Eastside Anaheim's turf, during a time of heightened tensions between Eastside Anaheim and two rival gangs, next to a truck whose open bed contained a partially hidden, but easily accessible gun. The gun contained DNA from at least three people, suggesting it was a communal gun. Upon seeing the police, Reyes and Bribiesca ducked and hid. Defendant struggled to prevent the police from discovering something and threw it toward the back of the truck. A methamphetamine pipe and a used syringe were later found in the truck bed, along with the gun. Defendant admitted that a gang member who possesses a gun while on lookout is required to let other members know about the weapon. Based on the entirety of the circumstances, the jury could reasonably infer defendant knew about the gun and intended to use it, if necessary, to protect, promote, and benefit his gang.

Defendant complains there was no "direct evidence" he knew about the gun or intended to constructively possess it, nor any "direct evidence" that the firearm was a gang gun. A trier of fact, however, may infer from sufficient *circumstantial* evidence that a defendant had dominion and control over a firearm. (*People v. Miranda*, *supra*, 192 Cal.App.4th at p. 411; *People v. Nieto* (1966) 247 Cal.App.2d 364, 368.)

9

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

MOORE, ACTING P. J.

ARONSON, J.